In re DAMRON CONSTRUCTION
COMPANY, INC., Debtor.

Harry L. MATHISON, Trustee, Plaintiff,

v.

HAYDON BUILDING MATERIALS OF
CADIZ, INC. and Noel Concrete
Co., Inc., Defendants.

Bankruptcy No. 96–50428(2)7.
Adversary No. 97–5002.

United States Bankruptcy Court,
W.D. Kentucky.

July 31, 1997.

Michael A. Richardson, Louisville, KY, for debtor.

Harry L. Mathison, Jr., Henderson, KY, trustee.

W. Howell Hopson, III, Cadiz, KY, for defendants.

## OPINION

J. WENDELL ROBERTS, Bankruptcy Judge.

This adversary proceeding was filed by the Trustee, Harry L. Mathison, pursuant to Kentucky Revised Statute 378.060, to recover as preferences payments made to the Defendants, Haydon Building Materials of Cadiz, Inc. ("Haydon") and Noel Concrete Co., Inc. ("Noel"), in the amounts of $18,785.74 and $6,036.53, respectively. The case came on for trial before this Court on July 9, 1997. Having fully reviewed the trial briefs filed by all parties, as well as the entire record, and having heard and fully reviewed all evidence and testimony put on by the parties and witnesses at trial, this Court finds that while the Trustee sustained his initial burden of proof in establishing a presumption that the transfers at issue were preferential in nature, the Defendants have overcome that presumption. This Court finds from the evidence before it and for the reasons set forth below, that there was no intent on behalf of the Debtor Corporation to prefer Haydon and Noel over other creditors, as required by KRS 378.060.

The Court enters its Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

## FINDINGS OF FACT

The basic facts concerning the amounts and dates of the transfers at issue are not in dispute.

The Debtor, Damron Construction Company, Inc., filed for protection under the Bankruptcy Code on May 20, 1996. The Debtor Corporation was a closely held corporation, owned and operated by Daniel K. Damron. Mr. Damron was the president, sole stockholder, and sole member of the Board of Directors of the corporation. Additionally, he managed the day-to-day affairs of the business.

Mr. Damron has been in the remodeling and construction business for twenty-three (23) years, approximately the last three of which he has been in business for himself. He began constructing houses in 1994, and in 1995 incorporated Damron Construction Company. By the fall of 1995, the Corporation began experiencing severe cash flow problems. In an effort to keep the business afloat and bring in a steady stream of construction work, the Debtor Corporation began constructing premanufactured homes known as the "All American Home." This brought additional financial problems, however, by significantly increasing the number of homes Mr. Damron was working on at any one time. The testimony at trial indicated that this exacerbated the Corporation's cash flow problems by tying up its resources in a variety of uncompleted projects.

The evidence at trial established that payment for the construction work was done on a "draw" basis. That is, it was tied to specific stages of each project's completion. The homeowner for which the homes were constructed would make specified payments upon completion of specified stages of the construction work, and the Debtor Corporation was unable to receive these "draws" until such time.

Therefore, in the fall of 1995, Damron Construction Company had resources tied up in a number of projects, but had not achieved the levels of completion earning it the right to its draw. Thus, the Corporation experienced serious cash flow problems. At the same time, the Corporation had completed a "spec" house, which had not yet been sold. Damron testified that the Corporation had $101,494.00 invested in that house.

During this time, Mr. Damron engaged in several measures in an attempt to cure the cash flow problems. He applied for a Small Business Administration loan, which he believed would cure the cash flow problems until he could complete the required stages of construction in the on-going projects to entitle the Corporation to make draws allowing cash to flow in. Mr. Damron expected to receive approximately $60,000.00 from the All American Homes he had under construction at that time. He also anticipated that the spec house would be sold at its full value, estimated to be in the neighborhood of $140,000.00 to $150,000.00, which would also have brought in some much needed cash.

Mr. Damron testified that during this period—the fall of 1995—the Corporation was unable to pay its debts as they came due and fell behind in its payments to nearly all of its suppliers. Consequently, Mr. Damron approached all of the creditors of the Corporation in an effort to work out payment schedules and arrangements in order to maintain the Corporation's credit with each supplier. He testified that it was essential to work out an acceptable payment arrangement with each of the creditors in order to continue receiving supplies, and, thus, continue in the construction business.

Mr. Damron was ultimately able to successfully achieve payment schedules that were acceptable to most, if not all, of the Corporation's suppliers, including Haydon and Noel. In many instances, Mr. Damron made payments to those suppliers from his personal funds, due to a lack of corporate funds. In other instances, he paid suppliers from corporate funds. The payments to Haydon and Noel represented the largest payments from the corporate funds. While numerous other creditors were also paid from corporate funds, the Trustee reported at trial that the amounts were too minimal to, in his best judgment, pursue.

Representatives from both Haydon and Noel were called to testify and confirmed the testimony given by Mr. Damron. With regard to Haydon, as of November of 1995, Damron Construction Company owed a balance due of approximately $38,000.00, $13,825.79 of which was more than 120 days old, and the December 1995 statement showed a balance in the amount of $4,733.55 as being more than 120 days old. Larry Boyd, the owner of Haydon, and Diane Dunn, the bookkeeper, testified that they generally become very concerned when a balance remains unpaid for more than 120 days. They confirmed that Mr. Damron contacted them to work out an acceptable payment in order to continue receiving supplies. Importantly, both witnesses testified that Mr. Damron's payment of balances more than 120 days old was an absolutely necessity for the Corporation to continue receiving supplies from Haydon. Accordingly, on December 6, 1995, Damron Construction Company made a payment in the amount of $13,825.79, representing the portion of the total balance that was more than 120 days old. A subsequent payment was made on January 11, 1996, in the amount of $4,959.95. That amount approximates the $4,733.55 balance shown as more than 120 days old on the statement ending December 31, 1995. It is these two payments, totaling $18,785.74 [1], which the Trustee seeks to recover from Haydon as being preferential in nature.

With regard to Noel, Dottie Goodwin, the secretary and bookkeeper of that company,

---

1. Trustee misstates this total as $18,788.74 in his Complaint.

as well as Robert Noel, who was working there at the time in question, both gave testimony that supported Mr. Damron's version of the facts. Damron Construction Company had fallen far behind in its payments in late 1995. Mr. Damron came to them to work out an acceptable payment that would allow the Corporation to continue its credit with that company and, thus, continue to receive supplies. Noel is Damron Construction Company's main concrete supplier. As a result of the payment schedule arrived at between Noel and Damron Construction, Damron Construction made a payment in the amount of $2,036.53 on December 10, 1995, a second payment in the amount of $2,000.00 on January 10, 1996, and a third payment in the amount of $2,000.00 on January 17, 1996. These are the payments in issue to Noel, totaling $6,036.53, which the Trustee seeks by this action to recover as preferential in nature.

Unfortunately for the Debtor Corporation, its efforts to cure its cash flow problems were unsuccessful. Mr. Damron was unable to get the Small Business Administration loan, and the spec house was ultimately sold at a forced sale at a 66% loss, for only $54,000.00. As a result of the severe cash flow problems, the Corporation was unable to complete the All American Homes under construction. Consequently, the Corporation not only was unable to receive payment for those projects, but was also subject to liability to the homeowners for failure to complete performance under those contracts and for the resulting damages.

In March of 1996, Mr. Damron made the decision to close the business and filed a personal bankruptcy action. Thereafter, on May 20, 1996, the Chapter 7 bankruptcy petition was filed on behalf of the Corporation.

There has been quite a bit of confusion regarding the assets of the Corporation. Apparently, there was significant intermingling of Mr. Damron's personal assets with assets that were intended to be corporate in nature. In addition, there was conflicting and inconsistent testimony presented at trial regarding the exact assets owned by the Corporation. In fact, it appears that Mr. Damron is confused with regard to which assets were in his name and which were in the Corporation's name. Consequently, this Court shall rely upon the bankruptcy schedules filed by Damron Construction Company in the main case. It appears from those schedules that the Corporation had few, if any, assets. While the Summary of Schedules indicates assets of a significant amount, the actual Schedule of Assets reflects the existence of only one corporate asset: tools valued at $900.00. This Court notes, however, that there is even a question with regard to the Corporation's ownership of this asset, as Mr. Damron testified at the § 341 First Meeting of Creditors that the tools belonged to him, personally. The schedules also reflect unsecured debts in excess of $100,000.00 and secured debts in excess of $160,000.00. Thus, it is clear that the Corporation was insolvent. Moreover, the testimony at trial was that the Corporation did not acquire any new assets during the period of December 1995 through the time it filed for bankruptcy. Accordingly, this Court finds that the Corporation was insolvent in December 1995 and January 1996, when the payments at issue were made.

### CONCLUSIONS OF LAW

#### I. JURISDICTION.

This Court has jurisdiction over this adversary proceeding per 28 U.S.C. §§ 157 and 1334.

Section 1334(a) grants the United States district courts original and exclusive jurisdiction of all bankruptcy cases and proceedings under Title 11. The bankruptcy courts' specific jurisdiction is derived from Section 157(a), which allows each district court to delegate to the bankruptcy courts within its district any or all of the types of cases referred to in § 1334(a). Subsection (b)(1) of Section 157 goes on to specifically provide:

Bankruptcy judges may hear and determine all cases under Title 11 and *all core proceedings arising under Title 11*, or arising in any case under Title 11, referred under subsection (a) of this section...

28 U.S.C. § 157(b)(1) (emphasis added).

Subsection (b)(2) sets forth the types of proceedings to be classified as "core pro-

ceedings." This Court finds that this action is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(f), which provides:

(b)(2) Core proceedings include ...

(f) proceedings to determine, avoid, or recover preferences.

## II. *KRS 378.060: PREFERENCE STATUTE.*

The transfers at issue were made outside of the 90 day preference period covered by Section 527 of the Bankruptcy Code. Accordingly, the Trustee brought this adversary proceeding under Kentucky's preference statute, KRS 378.060. The Kentucky statute provides that a transfer or conveyance may be set aside as a preference if two conditions are met: (1) the conveyance was made "in contemplation of insolvency," and (2) "with the design to prefer one or more creditors to the exclusion, in whole or in part, of others." To assist in the application of this statute, Kentucky law presumes the elements have been met where it is demonstrated that the debtor made the conveyance or transfer in issue while insolvent. *In re Rexplore Drilling, Inc.*, 971 F.2d 1219, 1223 (6th Cir.1992); *Grimes v. Grimes*, 86 Ky. 511, 6 S.W. 333 (1888); *See also, Bomanzi v. Tafel*, 415 S.W.2d 627 (Ky.1967). Thus, the Trustee bears the initial burden of proof. If the Trustee can demonstrate that the transfer was made while the debtor was insolvent, a presumption arises that the transfer was preferential in nature; i.e., that (1) it was made in contemplation of insolvency, *and* (2) it was made with the design to prefer one creditor over another. *Rexplore Drilling*, 971 F.2d at 1223.

Once this presumption arises, the burden of proof then shifts to the defendant to rebut the presumption. *Rexplore Drilling*, 971 F.2d at 1223; *Grimes*, 6 S.W. at 334. KRS 378.060 requires that *both* elements of the test be met in order for the transfer to be deemed a preference. Thus, the defendant need only rebut one of the two prongs. For example, if the defendant is able to demonstrate that "there was no motive or thought of giving an advantage or preference ... the presumption is rebutted." *Rexplore*

*Drilling*, 971 F.2d at 1223 (citing *Grimes*, 6 S.W. at 334).

This Court finds that the Trustee met his initial burden of proof, giving rise to the presumption that the transfers at issue to Haydon and Noel were preferences. The Court finds from the evidence presented that Damron Construction made the transfers while insolvent. The bankruptcy schedules filed in the main case indicate that Damron Construction owned assets worth only $900.00, at best, while its liabilities greatly exceeded that amount, with unsecured debts exceeding $100,000.00 and secured debts exceeding $160,000.00. Moreover, Mr. Damron testified that at the times of the transfers, the Corporation could not pay its debts as they came due. Mr. Damron contacted all of the Corporation's creditors to work out acceptable payment arrangements, in many instances having to make payments out of his personal funds because there were not sufficient corporate funds to make such payments. Mr. Damron furthermore testified that he was relying upon getting the Small Business Administration loan to carry the Corporation through financially and provide it with necessary funds until a cash flow could be established or at least be gotten back on track. This Court notes that Mr. Damron knew, or at least should have known, that there was no certainty that the Small Business Administration loan would be approved. He testified that he had been denied loans in the past. Moreover, Mr. Damron personally filed for bankruptcy on at least one occasion prior to his present personal bankruptcy action, and was denied at least one loan thereafter as a result of that bankruptcy. This Court finds it significant that Mr. Damron included an explanation and statement regarding the prior bankruptcy in his Small Business Administration loan application; thus, indicating that he recognized that it could pose an impediment to approval of the loan. Consequently, this Court finds that Mr. Damron knew the Small Business Administration loan was not a completed transaction, and that he could not absolutely count on obtaining the loan.

Thus, this Court finds that at the time of the transfers in issue to Haydon and Noel,

Mr. Damron was not only insolvent, but also was aware that he was insolvent. Accordingly, the Trustee met his initial burden of proof, causing the presumption to arise that the transfers were preferential in nature.

■ At that point, the burden of proof shifted to the Defendants, Haydon and Noel, to demonstrate either (1) that the conveyances were not made in contemplation of insolvency, or (2) that there was no design on the part of Damron Construction to prefer them over its other creditors. This Court finds that the Defendants clearly sustained their burden of proof by demonstrating that there was no design on the part of Damron Construction to prefer Haydon or Noel over its other creditors.

The unrefuted evidence at trial was that Mr. Damron approached *all of the Corporation's creditors* to work out a payment plan or make payment arrangements of some nature that would be acceptable to each one of those creditors in order to maintain the Corporation's credit and to continue receiving supplies. This was essential in order for Damron Construction Company to continue in business. Mr. Damron made payments to all such creditors, both out of the corporate funds and sometimes out of his personal funds when corporate funds were lacking. The debts to Haydon and Noel were, however, larger than the debts owed to other creditors; thus necessitating payments of a larger amount in order to maintain Damron Construction Company's credit and continue receiving supplies. Nevertheless, Mr. Damron did approach every such creditor and made payments acceptable to each one for the purpose of continuing the Corporation's receipt of supplies. Thus, this Court holds that Damron Construction did not prefer Haydon and Noel over the other creditors.

This finding is additionally supported by *Williams v. Carter,* 209 Ky. 461, 273 S.W. 88 (1925), which held that:

> [W]here a struggling debtor makes payments here and there for the purpose of maintaining his credit until times grow better, and as long as this was done with no intent to prefer one creditor to another, but, simply in an honest effort by the debtor to meet his obligations, no preference will be adjudged.

This Court finds from the evidence that the payments at issue are of the very nature described by the *Williams* case. 273 S.W. at 88. That is, they represent an honest effort by the Debtor to meet its obligations for the purpose of maintaining its credit until times could grow better.

### CONCLUSION

For the above stated reasons, this Court holds that the payments to Haydon Construction Company made on December 6, 1995 and January 11, 1996, totaling $18,785.74, and the payments to Noel Concrete Company on December 10, 1995, January 10, 1996 and January 17, 1996, totaling $6,036.53 are not preferences under KRS 378.060. Consequently, judgment will be entered in favor of the Defendants.